**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | 02:08-cr-0404-04 |
| | ) | 02:08-cr-0404-05 |
| ALEXANDER LITT and ROMAN | ) | |
| LITT | ) | |

**MEMORANDUM OPINION AND ORDER OF COURT**

Presently before the Court is the MOTION TO DISMISS INDICTMENT and the BRIEF in support filed by Defendant Roman Litt (Document Nos. 104 and 126), the MOTION TO DISMISS INDICTMENT and the RESPONSE AND BRIEF in support filed by Defendant Alexander Litt (Document Nos. 117, 127, and 128), and the omnibus RESPONSE filed by the government (Document No. 113). On July 28, 2009, the Court conducted an evidentiary hearing on the motions to dismiss the indictment at which all parties were represented by counsel who presented and argued the issues skillfully and effectively. Immigration and Customs Enforcement Special Agent Michael Opferman and Internal Revenue Service Special Agent Kevin Petrulak testified on behalf of the government.

At the conclusion of the evidentiary hearing, both Defendants moved to file additional post-hearing brief(s) within thirty (30) days of the filing of the transcript, and the government requested an additional ten (10) days in which to file a reply brief. The Court ordered that a transcript of the proceedings be prepared and granted the time to file additional briefs. The post-hearing briefs were timely filed and the matter is now ripe for disposition.

Based on the testimony and evidence presented at the evidentiary hearing, the applicable law, and the written submissions of the parties, the Motions to Dismiss the Indictment will be denied.

## FACTS AND PROCEDURAL HISTORY

Defendants Alexander Litt and Roman Litt (collectively "Defendants") are two of six named defendants in a thirty-seven (37) count  Indictment which was returned by a Federal Grand Jury on November 19, 2008.  Both Defendants are charged only in Counts One and Three of the Indictment.  Count One of the Indictment charges Defendants with conspiracy to harbor aliens for the purpose of commercial advantage and private financial gain, in violation of Title 18, United States Code, § 371 and Count Three of the Indictment charges Defendants with conspiracy to launder money instruments in violation of Title 18, United States Code, § 1956(h).

According to the Indictment, Defendants created and controlled ARRA, Inc., an Ohio corporation with its principal office in Sharonville, Hamilton County, Ohio.  ARRA Inc., as well as other similar corporations owned by co-defendants and located throughout Ohio and western Pennsylvania, was an "employee leasing" company, engaged in the business of supplying employees to other businesses (generally as hotel workers or other service employees).  The Government alleges, *inter alia,* that as part of the conspiracy the Defendants  through their employee leasing companies agreed to provide documented workers who were permitted to be in the United States to client businesses in the United States.  However, the Defendants knew that the workers were neither authorized to remain and/or to work in the United States.

Defendants are alleged to have created bank accounts in which corporate checks made payable to ARRA, Inc., were deposited or cashed.   These checks represented a percentage of the

hourly wages earned by over 100 out-of-status ("illegal") alien workers employed by the employee leasing companies.  Other defendants named in the Indictment are charged with using their companies to lease apartments for the illegal aliens and to transport the illegal aliens to and from their places of employment.

In 2002, an investigation was commenced by the Immigration and Customs Enforcement Agency ("ICE") into possible alien harboring activity by Citiwide Management Group ("CMG"), an employee leasing company allegedly controlled by Yaroslav Rochniak and Gregory Kucher, two of the named defendants in this case.  (Tr. at 11).  At the outset of the investigation, ICE agents were not aware of the full scope of the alleged conspiracy, but they found that the investigation continued to grow steadily between 2002 and 2008.  According to testimony from ICE Special Agent Michael Opferman ("Agent Opferman"), only eight or nine illegal aliens with ties to the employee leasing companies were discovered by government agents prior to the fall of 2005.  (Tr. at 27).  Some of these aliens were detained and released pending immigration hearings, while others were "turned around" by Customs and Border Protection agents after the aliens had left the United States and were attempting to re-enter the country.  (Tr. at 27-29).

The Government concedes that none of the aliens discovered by investigators prior to the fall of 2005 mentioned either Defendant Alexander Litt or Defendant Roman Litt to investigators.  (Document No. 113 at 3).  Further testimony affirmatively established that ICE investigators only instituted deportation proceedings against one alien prior to September 2005, and that alien was not, in fact, deported.  (Tr. at 30-31).  Additionally, Agent Opferman testified that prior to August 2005, neither Defendant Alexander Litt nor Defendant Roman Litt was known to investigators and neither was the subject of the ICE investigation.  (Tr. at 36).

On September 8, 2005, approximately twenty-nine (29) search warrants were executed in the Pittsburgh and Cleveland metropolitan areas as part of the ongoing ICE investigation.  (Tr. at 42-44).  At that time, approximately forty-three (43) illegal aliens were arrested in the Pittsburgh area and approximately twelve (12) illegal aliens were arrested in Cleveland, Ohio, all of whom were interviewed to varying degrees by government agents following their arrest.  (Tr. at 53); (Document No. 113 at 4).  Following the execution of the search warrants, one of the arrested illegal aliens was shown a picture of Defendant Alexander Litt but the alien was unable to identify him, (Tr. at 55), and none of the other arrested illegal aliens provided any information about either Defendant.  (Tr. at 63).  Testimony at the hearing revealed that following the execution of the search warrants, most of the illegal aliens that the ICE investigators detained were field interviewed, and the results of that questioning were recorded on a form I-213, a Record of Deportable Alien.  (Tr. at 50).  Most of the aliens found to be in the country illegally were arrested, told to report for an immigration hearing, and released by the end of the day on September 8, 2005.  (Tr. at 53).

As a result of the execution of the September 2005 search warrants, investigators recovered "boxes and boxes" of financial records, documents, computers, and cash, which had to be analyzed as part of the investigation.  (Tr. at 45-46).  Thereafter, in October 2005, subpoenas for additional information regarding financial information and account records were issued.

Agent Opferman testified that the investigation did not start focusing on Alexander Litt and/or Roman Litt until late 2006 or early 2007.  (Tr. at 70).  Questions regarding the Litts were first raised in interviews conducted with hotel managers and financial institutions.  (Tr. at 70).

4

Testimony at the hearing from Internal Revenue Service Special Agent Kevin Petrulak ("Agent Petrulak") confirmed the sheer volume of evidence associated with the investigation, as well as the pain-staking work of sifting through such material.  (Tr. at 82-109).  Agent Petrulak testified that he was assigned to review and analyze the financial records from the employee leasing companies, which consisted of over 60,000 pages of financial records and was assembled piecemeal from several banks over a number of years.  (Tr. at 102-05).  According to Agent Petrulak, the Indictment was brought before the grand jury as quickly as possible given the scope of the investigation and the delays associated with getting approval for such an indictment.  (Tr. at 105-07).

Testimony at the hearing failed to produce an accurate number of aliens that were either deported from the United States or "turned away" at the border during the course of the entire investigation.  Agent Opferman testified that ICE instituted deportation proceedings against only one person prior to the September 2005 search warrants, although some aliens had left the United States voluntarily and some were turned away while trying to re-enter the United States.  (Tr. at 28-31).  Other aliens initially detained during the execution of the search warrants were found to be green card holders legally living in the United States.  (Tr. at 50).  Additionally, some of the aliens discovered during the investigation still remain in the United States.  (Document No. 113 at 5); (Tr. at 33-34).  Nevertheless, the testimony indicates that of all the illegal aliens with ties to the investigation discovered by government agents, very few were actually deported as a result of the actions undertaken by the ICE investigators.

The Government has repeatedly conceded that none of the aliens who were discovered in connection with the September 2005 search warrants knew the Defendants.  (Tr. at 63).

Moreover, the Government contends that some of the aliens who have left the United States actually had information that would have been benefitted the Government.  (Document No. 113 at 5).  Finally, at the hearing, the Government provided Defendants with compact discs that contain the names of over 400 aliens encountered throughout the investigation.  (Tr. at 50-52).  These discs also contain the I-213 reports generated during the interview process following the September 2005 search warrants.  (Tr. at 50-52).

## ANALYSIS

Defendants present three grounds on which the Indictment should be dismissed.  First, they argue that the Government violated their Sixth Amendment right to compel testimony of favorable witnesses when it arrested, interviewed and then allegedly deported some of the aliens. Defendants believe that the deported illegal aliens would have provided "exculpatory evidence" in the sense that they would have testified that they did not know the Defendants.  Ultimately, Defendants believe that this lack of knowledge is both "material and favorable to [their] defense" and that such testimony reasonably could affect the ultimate determination of the  jury.

Second, Defendants contend that their Fifth Amendment right to due process has been violated by the Government because Defendants were never given the opportunity to depose the illegal aliens prior to their deportation, thereby affording the Government an unfair advantage at trial.  Finally, Defendants allege that the Government has engaged in unreasonable delay in bringing the Indictment.

The Government responds first by contending that a victim's knowledge of a co-conspirator is not necessary to establish the existence of a conspiracy.  As such, the Government argues that the Defendants cannot rely on the lack of knowledge by the aliens as material or

6

favorable to their defense.  Next, the Government contends that Defendants have failed to show bad faith or prejudice on the part of government investigators, which is necessary to successfully pursue a Fifth Amendment due process and a Sixth Amendment compulsory process claim with regard to deported witnesses.  Finally, the Government argues that there was no unreasonable delay in bringing this Indictment.  To support its position, the Government presented testimony which demonstrated the many challenges faced by the investigators during the course of the ICE investigation, all of which undeniably led to delay, albeit necessary, in bringing the Indictment. The Government specifically points to the sheer volume of material, the lack of staffing that plagued the investigation from the start, the scope of the investigation, and the procedural requirements that had to be followed during the investigation as reasonable explanations for the delay in bringing the indictment.

The Court finds that although the testimony from an undetermined number of deported aliens may establish that the aliens did not know Defendants, there is no evidence to indicate that such evidence would be material or favorable to Defendants' defense, nor would such evidence be anything but cumulative to that which is already available.  Additionally, the Court finds Defendants' argument that their Fifth Amendment right to due process was violated to be without merit because (i) Defendants cannot meet the prerequisites necessary for such a showing (a test that mirrors the test for violations of the Sixth Amendment) and (ii) the facts of this case are easily distinguishable from the cases relied upon by Defendants.  Finally, the Court finds that the evidence presented by the Government at the hearing establishes that there was no unreasonable delay in bringing the Indictment.  Accordingly, as explained in detail, *infra*, the motions to dismiss the Indictment will be denied.

I.      **Sixth Amendment Compulsory Process Argument**

      The Sixth Amendment compulsory process claim argued by Defendants appears to be novel in the courts within the Third Circuit.  As such, the Court finds that it is instructive to look to other courts where immigration issues, like those presently before the Court, arise more frequently.  Consequently, this Court will not only look to binding United States Supreme Court precedent, but also to persuasive decisions by courts in the Ninth Circuit in order to make the legal determinations necessary to resolve the present motions.

      The Government relies heavily on the case of *United States v. Valenzuela-Bernal*, 458 U.S. 858 (1982), which overruled the "conceivable benefit test" that had been established in the case of *United States v. Mendez-Rodriguez*, 450 F.2d 1 (9th Cir. 1971).  The conceivable benefit test only required a defendant to show that testimony from a deported witness could "conceivably benefit the defendant."  *Valenzuela-Bernal*, 458 U.S. at 862.  In *Valenzuela-Bernal*, the United States Supreme Court found that the 'conceivable benefit' test was excessively broad, and held that

> [t]he mere fact that the Government deports such witnesses is not sufficient to establish a violation of the Compulsory Process Clause of the *Sixth Amendment* or the *Due Process Clause of the Fifth Amendment* [sic].  A violation of these provisions requires some showing that the evidence lost would be both material and favorable to the defense.

*Id.* at 872-73.

      In *Valenzuela-Bernal*, the Supreme Court refined the conceivable benefit test by finding that both the Sixth Amendment right to compulsory process and the Fifth Amendment right to due process require a defendant to show more than a mere "absence of testimony."  *Valenzuela-Bernal*, 458 U.S. at 867 (citing *Washington v. Texas*, 388 U.S. 14 (1967)).  In raising the

threshold, the Supreme Court found that, in order to establish a violation of the Sixth

Amendment, a defendant must make a plausible showing that the testimony would have been

both material *and* favorable to the defense, because "the *Sixth Amendment* **does not guarantee**

criminal defendants the right to compel the attendance of **any and all witnesses**." *Id.* (emphasis

added). The requirement that the testimony be material and favorable further requires that the

evidence be *new*, and "not merely cumulative to the testimony of available witnesses." *Id.* at

873.

Later, in *United States v. Gastelum-Almeida*, 298 F.3d 1167, 1174 (9th Cir. 2002), the

United States Court of Appeals for the Ninth Circuit further refined the parameters set forth by

the Supreme Court in *Valenzuela-Bernal*. In *Gastelum-Almeida*, the appellate court established a

two-part test for determining whether the Sixth Amendment rights of a criminal defendant have

been violated *to wit*: a defendant must prove that "the government acted in bad faith *and* that

this conduct resulted in prejudice to [defendant's] case." *Id.* (citing *United States v. Dring*, 930

F.2d 687, 693 (9th Cir. 1991)); *see also United States v. Corrales-Fernandez*, No. CR-08-611-

PHX, 2009 WL 1286101, at *1 (D. Ariz., May 7, 2009) (applying the two-part test from

*Gastelum-Almeida* to both a Fifth Amendment due process claim and to a Sixth Amendment

compulsory process claim).

In addition to the test itself, *Gastelum-Almeida* also established the underlying

requirements for each part of the test. Bad faith requires a showing by the defendant that either

(1) the government failed to follow normal deportation procedures or (2) the government gained

an unfair tactical advantage at trial based on the deportation. *Gastelum-Almeida*, 298 F.3d at

1174. Prejudice is established under the *Valenzuela-Bernal* test by a showing that the testimony

9

of the deported witnesses is both material and favorable to defendant's case.  *Id.*  Consequently

the test, as established by both the United States Supreme Court and the Court of Appeals for the

Ninth Circuit, sets a high standard for proving a violation of Constitutional rights under both the

Fifth and Sixth Amendments.  *E.g. Corrales-Fernandez*, 2009 WL 1286101, at *1.

      Accordingly, Defendants in this case must show that the deportation of the aliens was

conducted in bad faith and that such deportation resulted in prejudice to their case.  *Gastelum-*

*Almeida*, 298 F.3d at 1174.  The Court finds that the evidentiary record is devoid of any evidence

which demonstrates that (i) the Government engaged in bad faith during the investigation by

departing from normal deportation procedures and (ii) any deportation has resulted in prejudice

to the Defendants' case.

      To the contrary, the testimony at the hearing revealed that government investigators

deported few, if any, aliens in connection with this case, and none of the testimony reflected that

the government deviated from any standard deportation procedures.  Indeed, some of the aliens

in question left the United States of their own accord and others were prevented from re-entering

the United States by agents from Customs and Border Protection.  None of these "deportations"

had anything to do with the investigation itself, because the aliens left on their own, or were

turned around by agents from a separate government agency, who had no knowledge of the ICE

investigation.

      The Court further finds that the bad faith argument advanced by the Defendants also fails

in light of the fact that some of the aliens encountered during the investigation continue to reside

in the United States; if the Government wanted to deport those witnesses favorable to

Defendants, certainly it would not allow those witnesses to remain in the United States and

10

potentially be called as witnesses at trial.  Further, the Government does not stand to gain any advantage at trial, as it has already admitted that some of the deported aliens actually possess information favorable to its case.  Additionally, any witnesses still in the United States that will be called by the Government will be equally available to Defendants.

The Court further finds that in addition to the Government's good faith actions during the course of the investigation, its actions subsequent to the Indictment being returned by the Grand Jury also reflect good faith on behalf of the Government.  For example, the Government has made available to Defendants the names of all the aliens connected with the investigation, as well as the I-213 reports of the interviews conducted subsequent to the arrests in September 2005.

In addition, the Government states that until at least August 2005, investigators were not even aware of Defendants' involvement in the case.  As such, it would be highly unlikely that the Government could deport witnesses in bad faith when its own investigators were not even aware of Defendants at the time of the deportation.  In light of such facts, it is impossible for this Court to find that any of the deportations were conducted in bad faith.  All of the evidence and testimony presented at the hearing demonstrates the Government's good-faith attempts to comply with all Constitutional requirements, while still upholding its duty to faithfully execute the immigration policy.  *See Valenzuela-Bernal*, 458 U.S. at 862.

Next, the Court finds that Defendants have failed to demonstrate that the Government's actions have resulted in any prejudice to their case, which would require a showing that the anticipated trial testimony of the deported aliens is material and favorable to their defense.  *See Gastelum-Almeida*, 298 F.3d at 1174.  Defendants' claim fails for two reasons; first, Defendants

11

have failed to establish why the proposed testimony of the illegal aliens is dispositive of a conspiracy charge.  Second, the "exculpatory evidence" that Defendants claim would be given by the deported aliens is merely cumulative to discovery that has already been provided by the Government to the Defendants.

Defendants cannot characterize the anticipated trial testimony of the deported aliens as either material or favorable to their defense because testimony which indicates that the victim of a conspiracy does not know certain members of that conspiracy is not dispositive.  Defendants characterize the illegal alien witnesses as the *corpus delicti* of the crimes and seek to prove that the illegal aliens did not know either Defendant.  Whether a victim has knowledge of each member of a conspiracy is not relevant to proving (or disproving) whether those charged as co-conspirators actually participated in the conspiracy.  Evidence adduced at the hearing indicated that the charged conspiracy was active in at least three states (Ohio, Pennsylvania, and New York).  Due to the nature of the alleged involvement by Defendants in the conspiracy, it is unlikely that the illegal alien employees would have ever had contact with them.

Furthermore, even co-conspirators need not be aware of all other participants in a conspiracy, as courts have found that not knowing the identity of other members of a conspiracy does not relieve co-conspirators of criminal liability.  *See e.g. United States v. Allen*, 613 F.2d 1248, 1253 (3rd Cir. 1980) (citing *Rogers v. U.S.*, 340 U.S. 367, 375 (1951)).  Because even co-conspirators need not know one another in order to establish criminal liability, it may be inferred that a victim's knowledge of all co-conspirators is absolutely not necessary to establish or refute culpability.

12

In order to prove that the testimony is both material and favorable, the testimony to be elicited must also present new and different evidence. *See Valenzuela-Bernal*, 458 U.S. at 863. Many of the aliens involved in this case are still in the United States and are presumably available to testify at trial. Any further testimony from the alleged deported aliens would merely be cumulative to that which is readily available from those aliens who remain in the United States. *Valenzuela-Bernal*, 458 U.S. at 873. Consequently, the fact that the evidence would be cumulative makes it insufficient to warrant a finding that Defendants' Sixth Amendment right to compulsory process has been violated. *Id.*

## II.    Fifth Amendment Due Process Argument

As indicated above, the United States Supreme Court has also increased the threshold determination as to when deportation of a witness violates a defendant's Fifth Amendment right to due process. *See Valenzuela-Bernal*, 458 U.S. at 872-73; *see also Corrales-Fernandez*, 2009 WL 1286101, at *1. The test is now the same as that for violations of the Sixth Amendment compulsory process, and requires a showing that the deported witness would have provided testimony that is both material and favorable to the defense. As discussed *supra*, the Court finds that Defendants have failed to meet this requirement.

Defendants cite two cases in support of the proposition that their rights to due process were violated because the aliens were allegedly not deposed prior to their deportation. The Court finds this argument to be without merit for a number of reasons, not the least of which being that the proposed testimony ultimately fails to meet the proper Supreme Court standard under

13

*Valenzuela-Bernal*. Additionally, the cases cited by Defendants are distinguishable from the case sub judice for a number of reasons.

First, in *Aguilar-Ayala v. Ruiz*, 973 F.2d 411 (5th Cir. 1992), the aliens were **material witnesses** for the government, and the defendants were deprived of the opportunity to depose the alien witnesses prior to their deportation.  The aliens in this case are not material witnesses for the Government, but rather were discovered by investigators during the course of the government investigation, primarily before Defendants were even subjects of that investigation. Additionally, the Government has not expressed any desire to use any deported aliens as witnesses at trial, much less to use them as material witnesses.

Defendants also rely upon an opinion from the United States Court of Appeals for the Ninth Circuit, *Torres-Ruiz v. United States District Court for the Southern District of California*, 120 F.3d 933 (9th Cir. 1997).  *Torres-Ruiz* is distinguishable from the present case because it involved **sworn statements** made by **material witnesses** against the defendant in an alien smuggling prosecution.  *Id.* at 934.  The claim in *Torres-Ruiz* also involved a petition for a writ of mandamus against the district court, seeking the release of the detained aliens.  In the present case, as explained *supra*, the aliens are not government material witnesses and were not detained or deported pursuant to any pending criminal prosecution; indeed many of the aliens in this case were discovered several years before the Indictment against Defendants was ever presented to the Grand Jury.  Additionally, many of the aliens did not even know Defendants, and certainly did not make sworn statements regarding Defendants' guilt.  Consequently, apart from the analysis under *Valenzuela-Bernal*, the argument that Defendants' Fifth Amendment right to due process was denied because of an inability to depose the alleged aliens also fails.

14

III.    **Unnecessary Delay Argument**

The final argument presented by Defendants is that the Government took an unreasonable amount of time in bringing an indictment against them.  In response, the Government has pointed out that Agents Opferman and Petrulak worked with minimal staff for much of the investigation, sifting through thousands of pages of financial records and other documents.  The Government further contends that any delay was a necessary result of the scope of the investigation; indeed, investigators did not even know of the participation of Defendants until the middle of 2005. Finally, Agent Opferman testified that the U.S. Department of Justice Tax Division had to give its final approval for an indictment against Defendants, and that the investigators requested an expedited review of the proposed indictment.  (Tr. at 106).  However, despite the expedited review, a further delay was encountered when the investigators had to alter the proposed money laundering charges due to a July 2008 United States Supreme Court decision involving the federal money laundering statute.[1]  (Tr. at 107).

Given the sheer number of procedural and investigatory hurdles encountered by investigators in this case, the Court does not find that the Government engaged in unreasonable delay in bringing the Indictment.

## <u>CONCLUSION</u>

Due to the fact that Defendants have not shown that the testimony of the alleged deported aliens would be material and favorable to their defense, and due to the fact that such evidence

---

[1] On June 28, 2008, the United States Supreme Court issued its decision in *United States v. Santos*, --- U.S. ---, 128 S. Ct. 2020 (June 28, 2008) (slip opinion), which conceivably narrowed the scope of the federal money laundering statute.

would merely be cumulative to that which is already available, the Court finds that Defendants'

arguments under both the Fifth and Sixth Amendment fail.  Additionally, because the

Government has shown that the scope of the investigation rendered it difficult, if not impossible

to present the Indictment any faster than was done, the Court finds that there has been no

showing of unreasonable delay in bringing the instant Indictment.

     For the reasons hereinabove stated,  Defendants' Motions to Dismiss Indictment will be

denied.  An appropriate order follows.


                         McVerry, J.

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | 02:08-cr-0404-04 |
| | ) | 02:08-cr-0404-05 |
| ALEXANDER LITT; ROMAN | ) | |
| LITT | ) | |

**ORDER OF COURT**

**AND NOW**, this 6th day of November, 2009, in accordance with the foregoing

Memorandum Opinion, it is hereby **ORDERED, ADJUDGED AND DECREED** that the

Motion to Dismiss the Indictment filed by Roman Litt is **DENIED**; and the Motion to Dismiss

the Indictment filed by Alexander Litt is **DENIED**.

BY THE COURT:

<u>s/Terrence F. McVerry</u>
United States District Court Judge

cc:    Margaret E. Picking,
Assistant U.S. Attorney
Email: margaret.picking@usdoj.gov

Mary R. Beier, Esquire
Beier & Beier
Email: mbeier@choiceonemail.com

Chris Rand Eyster, Esquire
Email: eysman@earthlink.net